# EXHIBIT A

Name of Subscriber: <u>Duke Advantage, LLC</u>

## <u>SUBSCRIPTION AGREEMENT</u>

CorMatrix Cardiovascular, Inc.
14980 East Bluff Road
Alpharetta, Georgia 30004

### ARTICLE 1    Subscription

Section 1.1    <u>Subscription</u>.  The undersigned hereby irrevocably subscribes for and agrees to purchase shares of the Common Stock, par value $0.001 per share (the "Common Stock") of CorMatrix Cardiovascular, Inc., a Georgia corporation (the "Company"), at a price of approximately $13.91 per share and in the amount set forth below and on the terms and conditions described in this subscription agreement (this "Subscription Agreement") dated as of February 9, 2004.

**Amount And Dollar Value Of**          <u>25,161</u> shares

**Common Stock Subscribed For:**        <u>$ 350,000.00</u>

THE UNDERSIGNED IS REQUIRED TO CHECK THE APPROPRIATE BOX ON THE ACCREDITED INVESTOR CERTIFICATION FOUND ON PAGE 7 HEREOF TO CERTIFY HIS, HER OR ITS STATUS AS AN ACCREDITED INVESTOR.

Section 1.2    <u>Payment</u>.  The undersigned agrees to wire $300,000.00 by February 10, 2004 and $50,000 by February 28, 2004 in immediately available funds, to the account of the Company in the amount indicated in Section 1.1 above.  Wire transfers in the amount indicated above shall be made to the account and account name as previously provided.

Section 1.3    <u>Acceptance or Rejection</u>.  The undersigned understands that the Company will accept this subscription (and only with respect to it) only by executing and delivering this Subscription Agreement and Stockholders' Agreement.  The undersigned acknowledges that the undersigned may not withdraw this subscription.

In the event that this subscription is rejected in part by the Company, there shall be returned to the undersigned the difference between the subscription amount paid to it and the subscription price allocable to the amount of the Common Stock accepted.  In the event this subscription is rejected in its entirety, the subscription amount paid will be promptly returned to the undersigned without deduction and without interest, and this Subscription Agreement shall have no force or effect.

**EXHIBIT A**

Section 1.4    <u>Other Subscription Agreements; Closings</u>.  The certificate representing the Common Stock purchased together with copies of the executed Stockholders' Agreement Subscription Agreement will be delivered to you promptly after the closing.

ARTICLE 2    Investor Representations and Warranties

The undersigned makes the following representations and warranties with the intent that the same may be relied upon by the Company:

Section 2.1    <u>Information</u>.  The undersigned acknowledges that the undersigned has been offered the opportunity to obtain information, to verify the accuracy of the information received by him, her or it and to evaluate the merits and risks of this investment and to ask questions of and receive satisfactory answers concerning the terms and conditions of this investment.  The undersigned has received copies of such documents and information as he, she or it has deemed necessary in order to make an informed investment decision with respect to the investment being made hereby and the Company has made its officers available to the undersigned to answer questions concerning the Company and the investment being made hereby.  In making the decision to purchase the Common Stock, the undersigned has relied and will rely solely upon independent investigations made by him, her or it.  The undersigned is not relying on the Company with respect to any tax or other economic considerations involved in this investment.  Other than as set forth in Article III hereof, no representations or warranties have been made to the undersigned by the Company.  To the extent the undersigned has deemed it appropriate, the undersigned has consulted with his, her or its own attorneys and other advisors with respect to all matters concerning this investment.

Section 2.2    <u>Not a Registered Offering</u>.   The undersigned understands that the Common Stock has not been and is not being registered either with the Securities and Exchange Commission ("SEC") nor with the governmental entity charged with regulating the offer and sale of securities under the securities laws and regulations of the state of residence of the undersigned and are being offered and sold pursuant to the exemption from registration provided in Section 4(2) of the Securities Act of 1933, as amended (the "1933 Act"), and Rule 506 of Regulation D ("Regulation D") promulgated under the 1933 Act by the SEC and limited exemptions provided in the "Blue Sky" laws of the state of residence of the undersigned and that no governmental agency has recommended or endorsed the Securities or made any finding or determination relating to the fairness for investment of the Common Stock.  The undersigned is unaware of, and is in no way relying on, any form of general solicitation or general advertising in connection with the offer and sale of the Common Stock.  The undersigned is purchasing the Common Stock without being furnished any offering or sales literature or prospectus.

Section 2.3    <u>Purchase for Investment</u>.  The undersigned is subscribing for the Common Stock solely for his, her or its own account for investment purposes and not with a view to, or with any intention of, a distribution, sale or subdivision for the account of any other individual, corporation, firm, partnership, limited liability company, joint venture, association or person.

EXHIBIT A

Section 2.4    Accredited Investor and other Investment Representations.    The undersigned represents and warrants that the undersigned is an "accredited investor" as defined in Rule 501(a) of Regulation D under the 1933 Act and that the undersigned has accurately completed the Accredited Investor Certification, which precedes the signature page to this Subscription Agreement.

Section 2.5    Restrictions on Transfer

(a)    The undersigned understands and agrees that because the offer and sale of the Common Stock subscribed for herein have not been registered under federal or state securities laws, the Securities acquired may not at any time be sold or otherwise disposed of by the undersigned unless they are registered under the 1933 Act or there is applicable to such sale or other disposition one of the exemptions from registration set forth in the 1933 Act, the rules and regulations of the SEC thereunder and applicable state law.  The undersigned further understands that the Company has no obligation or present intention to register the Common Stock or to permit its sale other than in strict compliance with the 1933 Act, SEC rules and regulations thereunder, and applicable state law.  The undersigned recognizes that, as a result of the aforementioned restrictions, there is not and will be no public market for the Common Stock subscribed for hereunder.  The undersigned expects to hold the Common Stock for an indefinite period and understands that the undersigned will not readily be able to liquidate this investment even in case of an emergency.

(b)    The undersigned has received and read a copy of the Stockholders Agreement among and understands the restrictions on transfer contained therein.  As a condition to the issuance of the Common Stock to the undersigned, the undersigned agrees to become a party to the Stockholders Agreement.

(c)    All certificates representing the Common Stock to be issued to the undersigned pursuant to this Agreement shall have endorsed thereon legends substantially as follows:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAW AND MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT COVERING THESE SECURITIES UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER THE ACT OR UNDER APPLICABLE STATE SECURITIES LAWS."

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE PROVISIONS OF A STOCKHOLDERS AGREEMENT DATED NOVEMBER 16, 2001 AMONG THE COMPANY AND THE OTHER PARTIES THERETO, A COPY OF WHICH AGREEMENT IS AVAILABLE FOR INSPECTION AT THE OFFICES OF THE COMPANY OR WILL BE MADE AVAILABLE UPON REQUEST."

EXHIBIT A

Section 2.6   <u>Investment Risks</u>. The undersigned has such knowledge and experience in financial and business matters that he, she or it is capable of evaluating the merits and risks of an investment in the Common Stock. The undersigned recognizes that the Company is newly organized and is a development stage company with extremely limited financial and operating history, and that an investment in the Company involves very significant risks. The undersigned further recognizes that (A) an investment in the Company is highly speculative, (B) an investor may not be able to liquidate his, her or its investment, (C) transferability of the Common Stock is extremely limited, (D) in the event of a disposition, the investor could sustain a loss of his, her or its entire investment, (E) the Company will require significant additional financing in order to continue its business, (F) the Company has never had any revenues and is not expected to have any revenues for the foreseeable future, and (G) the Company likely will need to raise additional funds in the near future through the sale of equity, and that any such sale may be on terms to investors that are more favorable than the terms to the undersigned. The undersigned is capable of bearing the economic risks of an investment in the Common Stock, including, but not limited to, the possibility of a complete loss of the undersigned's investment, as well as limitations on the transferability of the Common Stock, which may make the liquidation of an investment in the Common Stock difficult or impossible for the indefinite future.

Section 2.7   <u>Residence</u>. The undersigned, if a natural person, is a bona fide resident of the state set forth in his or her address on the signature page to this Subscription Agreement. The undersigned, if an entity, has its principal place of business at the mailing address set forth on the signature page of this Subscription Agreement.

Section 2.8   <u>Investor Information; Survival of Representations and Warranties</u>. The representations, warranties and agreements contained in this Article II shall survive the date hereof. Any information that the undersigned is furnishing to the Company in this Subscription Agreement is correct and complete as of the date of this Subscription Agreement and if there should be any material change in such information prior to his, her or its admission as a stockholder of the Company, the undersigned will immediately furnish such revised or corrected information to the Company.

Section 2.9   <u>Due Organization</u>. If the undersigned is a corporation, partnership or limited liability company, the undersigned is duly organized, validly existing and in good standing under the jurisdiction of its organization, has all requisite power and authority to own, lease and operate its properties, to carry on its business as currently being conducted, to enter into this Subscription Agreement and to perform its obligations hereunder and thereunder.

Section 2.10  <u>Due Authorization</u>. If the undersigned is a corporation, partnership or limited liability company, the execution, delivery and performance by the undersigned of this Subscription Agreement and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of the undersigned.

Section 2.11  <u>Capacity</u>. If the undersigned is an individual, the undersigned has the capacity to execute, deliver and perform this Subscription Agreement.

EXHIBIT A

Section 2.12  <u>Enforceability</u>.  This Subscription Agreement is, or upon its execution and delivery will be, a valid and binding obligation of the undersigned, enforceable against the undersigned in accordance with its terms.

Section 2.13  <u>No Conflicts</u>.  Neither the execution, delivery nor performance by the undersigned of this Subscription Agreement, nor the consummation by the undersigned of the transactions contemplated hereby will (A) conflict with or result in a breach of any provision of the undersigned's certificate of incorporation, bylaws or other organizational documents, (B) cause a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any agreement, instrument or obligation to which the undersigned is a party or (C) violate any law, statute, rule, regulation, judgment, order, writ, injunction or decree of any court, administrative agency or governmental body, in each case applicable to the undersigned or its properties or assets.

Section 2.14  <u>No Approvals</u>.  No filing with, and no permit, authorization, consent or approval of, any person (governmental or private) is necessary for the consummation by the undersigned of the transactions contemplated by this Subscription Agreement.

Section 2.15  <u>Brokerage Commissions and Finders' Fees</u>.  Neither the undersigned, nor anyone acting on the undersigned's behalf, has taken any action which has resulted, or will result, in any claims for brokerage commissions or finders' fees by any person in connection with the transactions contemplated by this Subscription Agreement.

ARTICLE 3    Company Representations and Warranties

The Company makes the following representations and warranties with the intent that the same may be relied upon by the undersigned:

Section 3.1  <u>Due Organization</u>.  The Company is a corporation duly organized, validly existing and in good standing under the jurisdiction of its organization, has all requisite power and authority to own, lease and operate its properties, to carry on its business as currently being conducted, to enter into this Subscription Agreement and to perform its obligations hereunder.

Section 3.2  <u>Due Authorization</u>.  The execution, delivery and performance by the Company of this Subscription Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Company.

Section 3.3  <u>Enforceability</u>.  This Subscription Agreement is, or upon its execution and delivery will be, a valid and binding obligation of the Company, enforceable against the Company in accordance with its respective terms.

Section 3.4  <u>No Conflicts</u>.  Neither the execution, delivery nor performance by the Company of this Subscription Agreement, nor the consummation by the Company of the transactions contemplated hereby, will (A) conflict with or result in a breach of any provision of the Company's certificate of incorporation or by-laws, (B) cause a default (or give rise to any

EXHIBIT A

right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any agreement, instrument or obligation to which the Company is a party or (C) violate any law, statute, rule, regulation, judgment, order, writ, injunction or decree of any court, administrative agency or governmental body, in each case applicable to the Company or its properties or assets.

Section 3.5   No Approvals.  Assuming the accuracy of the representations contained in Article II, no filing with, and no permit, authorization, consent or approval of, any person (governmental or private) is necessary for the consummation by the Company of the transactions contemplated by this Subscription Agreement, other than filings under Federal and state securities laws.


ARTICLE 4   Miscellaneous Provisions

Section 4.1   Notices And Addresses.  All notices required to be given under this Subscription Agreement shall be in writing and shall be mailed by certified or registered mail, hand delivered or delivered by next business day courier. Any notice to be sent to the Company shall be mailed to the principal place of business of the Company or at such other address as the Company may specify in a notice sent to the undersigned. All notices to the undersigned shall be mailed or delivered to the address set forth on the signature page to this Subscription Agreement or to such other address as the undersigned may hereafter notify the Company of in writing. Notices shall be effective on the date three days after the date of mailing or, if hand delivered or delivered by next day business courier, on the date of delivery, provided, however, that notices to the Company shall be effective upon receipt.

Section 4.2   Governing Law; Jurisdiction.  (A) THIS SUBSCRIPTION AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF GEORGIA WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES, (B) THE UNDERSIGNED HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY GEORGIA STATE COURT OR UNITED STATES FEDERAL COURT SITTING IN THE STATE OF DELAWARE, OVER ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SUBSCRIPTION AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY, AND (C) THE UNDERSIGNED HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH GEORGIA STATE OR FEDERAL COURT.  THE UNDERSIGNED FURTHER WAIVES ANY OBJECTION TO VENUE IN SUCH COURT AND ANY OBJECTION TO AN ACTION OR PROCEEDING IN SUCH COURT ON THE BASIS OF A NON-CONVENIENT FORUM. THE UNDERSIGNED FURTHER AGREES THAT ANY ACTION OR PROCEEDING BROUGHT AGAINST THE COMPANY SHALL BE BROUGHT IN SUCH COURTS.  THE UNDERSIGNED AGREES TO WAIVE ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS SUBSCRIPTION AGREEMENT OR ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY.

EXHIBIT A

Section 4.3    Assignability.  This Subscription Agreement and the rights, interests and obligations hereunder are not transferable or assignable by the undersigned and the undersigned acknowledges and agrees that any transfer or assignment of the Common Stock shall be made only in accordance with all applicable laws.

Section 4.4    Successors And Assigns.  This Subscription Agreement shall be binding upon and inure to the benefit of the parties hereto, and each of their respective legal representatives and permitted successors.

Section 4.5    Counterparts.  This Subscription Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one instrument.

Section 4.6    Modifications To Be In Writing.  This Subscription Agreement constitutes the entire understanding of the parties hereto with respect to the subject matter hereof and no amendment, restatement, modification or alteration will be binding unless the same is in writing signed by the party against whom any such amendment, restatement, modification or alteration is sought to be enforced.

Section 4.7    Captions.  The captions are inserted for convenience of reference only and shall not affect the construction of this Subscription Agreement.

Section 4.8    Validity And Severability.  If any provision of this Subscription Agreement is held invalid or unenforceable, such decision shall not affect the validity or enforceability of any other provision of this Subscription Agreement, all of which other provisions shall remain in full force and effect.

Section 4.9    Statutory References.  Each reference in this Subscription Agreement to a particular statute or regulation, or a provision thereof, shall be deemed to refer to such statute or regulation, or provision thereof, or to any similar or superseding statute or regulation, or provision thereof, as is from time to time in effect.

******

EXHIBIT A

<u>Accredited Investor Certification</u>

**YOU MUST BE ABLE TO CHECK OFF AT LEAST ONE OF THE BOXES BELOW IN ORDER TO PURCHASE COMMON STOCK**

☐     The undersigned is a natural person who had individual income of more than $200,000 in each of the most recent years or joint income with his spouse in excess of $300,000 in each of the most recent two years and reasonably expects to reach that same income level for the current year ("income"), for purposes hereof, should be computed as follows: individual adjusted gross income, as reported (or to be reported) on a federal income tax return, increased by (a) any deduction of long-term capital gains under section 1202 of the Internal Revenue Code of 1986 (the "Code"), (b) any deduction for depletion under Section 611 et seq. of the Code, (c) any exclusion for interest under Section 103 of the Code and (d) any losses of a partnership as reported on Schedule E of Form 1040);

☐     The undersigned is a natural person whose individual net worth (i.e., total assets in excess of total liabilities), or joint net worth with his spouse, will at the time of purchase of the Common Stock be in excess of $1,000,000;

☐     The Purchaser is a corporation, Massachusetts or similar business trust, partnership, or limited liability company, or any organization described in Section 501(c)(3) of the Internal Revenue Code, not formed for the specific purpose of acquiring the Common Stock, with total assets in excess of $5,000,000;

☐     The undersigned is a trust (other than a revocable grantor trust), which trust has total assets in excess of $5,000,000, which is not formed for the specific purpose of acquiring the Common Stock offered hereby and whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D and who has such knowledge and experience in financial and business matters that he is capable of evaluating the risks and merits of an investment in the Common Stock;

☐     The undersigned is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, and either (a) the investment decision will be made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, insurance company, or a registered investment adviser; or (b) the employee benefit plan has total assets in excess of $5,000,000; or (c) the employee benefit plan is a self-directed plan, including an Individual Retirement Account, with the meaning of Title I of such act, and the person directing the purchase is an Accredited Investor**;

        **\*\*NOTE.** If the undersigned is relying solely on this item for its Accredited Investor status, please print the name of the person directing the purchase in the following space and furnish a completed and signed Accredited Investor Certification for such person.

☐     The undersigned is an investor otherwise satisfying the requirements of Section 501(a)(l), (2) or (3) of Regulation D promulgated under the 1933 Act, which includes but is not

**EXHIBIT A**

limited to, a self-directed employee benefit plan where investment decisions are made solely by persons who are "accredited investors" as otherwise defined in Regulation D;

☐    The undersigned is a member of the Board of Directors or an executive officer of the Company; or

    The undersigned is an entity (including an IRA or revocable grantor trust but other than a conventional trust) in which all of the equity owners meet the requirements of at least one of the above subparagraphs.

EXHIBIT A

## SUBSCRIPTION AGREEMENT
## SIGNATURE PAGE

If the subscriber is an INDIVIDUAL, or if purchased as JOINT TENANTS, as TENANTS IN COMMON, or a COMMUNITY PROPERTY:

_____          _____
Print Name(s)                      Social Security Number(s)

_____          _____
Signature(s) of subscriber(s)      Signature(s) of subscriber(s)

_____   Address: _____
Date                                 _____
                                     _____

If the subscriber is a PARTNERSHIP, CORPORATION, LLC or TRUST:

Duke Advantage LLC          83 - 0384060
Name of Entity              Federal Taxpayer ID Number

By: _Robert LaDuca_         _Delaware_
Name: Robert LaDuca         State of Organization
Title: Manager

2/10/04              Address: 2207 Concord Pike #310
Date                          Wilmington, DE 19803-2908

SUBSCRIPTION ACCEPTED AND AGREED TO this 10th day of February 2004.

CorMatrix Cardiovascular, Inc.


By: _____
Name: JOHN THOMAS
Title: C.F.O.

EXHIBIT A

## STOCKHOLDERS AGREEMENT

This Stockholders Agreement (this "*Agreement*") is made on November 16, 2001, by and among CorMatrix Cardiovascular, a Georgia corporation, with its principal offices located at 14980 East Bluff Road, Alpharetta, Georgia 30004 ("*Licensee*"), Purdue Research Foundation, Inc., an Indiana nonprofit corporation with offices located at 1291 Cumberland Avenue, West Lafayette, Indiana ("*PRF*"), the persons designated as Additional Investors in Schedule A (the "*Additional Investors*") and the individuals designated as Founding Stockholders in Schedule A (the "*Founding Stockholders*") (PRF, the Additional Investors and the Founding Stockholders, together with any other person or entity which may become a stockholder of the Licensee hereafter are, for so long as they are stockholders of Licensee, collectively referred to in this Agreement as the "*Stockholders*" or individually a "*Stockholder*.")

## BACKGROUND

A.    Concurrently with the execution of this Agreement, PRF is entering into a License Agreement with Licensee dated November 16, 2001 (the "*License Agreement*"), whereby PRF is licensing to Licensee certain technology owned by PRF;

B.    Concurrently with the execution of this Agreement, PRF is entering into a Stock Purchase Agreement with Licensee dated November 16, 2001 (the "*Stock Purchase Agreement*") whereby in partial consideration for the execution and delivery of the License Agreement by PRF, Licensee has agreed to issue to PRF certain shares of Licensee's capital stock;

C.    In partial consideration for the execution and delivery by PRF of the License Agreement, the parties have agreed to enter into this Stockholders Agreement; and

D.    The parties have determined that it is in the best interests of Licensee and the Stockholders to provide for certain rights and restrictions on the future disposition of Licensee's common stock, par value $.001 per share (the "*Common Stock*"), and various other matters set forth in this Agreement.

NOW, THEREFORE, in consideration of the agreements and mutual promises and covenants set forth in this Agreement, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE 1 – RESTRICTIONS ON TRANSFER OF SHARES

1.1 Restrictions on Stockholders.  Until such time as Licensee's securities are the subject of a Qualified Initial Public Offering (as hereinafter defined), or as expressly provided in this Agreement, no Stockholder shall sell, assign, transfer, give, bequeath, devise, donate or otherwise dispose of, or pledge, deposit or otherwise encumber, in any way or manner whatsoever, whether voluntary or involuntary (all of the foregoing hereinafter referred to as "transfer"), any legal or beneficial interest in any of the shares of Licensee's capital stock (collectively, the "*Shares*") now or hereafter owned (of record or beneficially) by such

**EXHIBIT A**

Stockholder except as expressly provided in this Agreement and in accordance with its terms and conditions.

1.2 <u>Certain Excluded Transfers</u>. The provisions of Article 2 and Article 3 of this Agreement shall not apply to the following transfer of shares by the Stockholders:

(a)  transfers of Shares from one Stockholder to another;

(b)  gifts, bequests or transfers by any individual Stockholder to spouses, parents, siblings, children, nieces, nephews, grandchildren, trusts for the benefit of any one or more of the foregoing or entities controlled by any one or more of the foregoing;

(c)  transfers from an estate of any individual Stockholder to any spouse or relative of the decedent or any trust for the benefit of any one or more of the foregoing;

(d)  transfers by any Stockholder to any affiliate, which shall include, as to any limited partnership, the general partners or limited partners of such partnership; and

(e)  in the case of transfers by PRF, transfers by PRF to any employee or former employee of PRF in connection with PRF's internal patent policy.

## ARTICLE 2 – STOCKHOLDER'S LIMITED RIGHT TO DISPOSE OF SHARES

2.1 <u>Offer to Sell Shares</u>. Except as otherwise provided in the Stock Purchase Agreement and Article 1 and Article 3 of this Agreement, if any Stockholder shall at any time desire to sell all or any part of such Stockholder's Shares, such Stockholder (the "*Selling Stockholder*") shall first prepare a written offer (the "*Offer*") to sell all, but not less than all, of such portion of the Shares which such Stockholder desires to offer for sale (the "*Offered Shares*") setting forth the proposed date of the sale, the proposed price per Share, and the other terms and conditions upon which the sale is proposed to be made. Such notice shall also specify whether a Third Party Purchaser (as hereinafter defined) has made an offer to acquire such Shares. The Selling Stockholder shall then transmit a copy of the Offer to Licensee. Within two (2) business days of receipt of the Offer, Licensee shall transmit a copy of the Offer to the Stockholders other than the Selling Stockholder.

2.2 <u>Option of Licensee</u>. Transmittal of the Offer to Licensee by the Selling Stockholder shall constitute an offer by the Selling Stockholder to sell the Selling Stockholder's Offered Shares to Licensee at the price and upon the terms set forth in the Offer. For a period of fifteen (15) days after the submission of the Offer to Licensee, Licensee shall have the option, exercisable by written notice to the Selling Stockholder with a copy to each of the other Stockholders, to accept the Selling Stockholder's Offer as to all or any part of the Selling Stockholder's Offered Shares. Such notice shall state the number of Shares Licensee will purchase, if any, and the number of Offered Shares available to be purchased.

2.3 <u>Option of Offeree Stockholders</u>. In the event that Licensee does not exercise its option with respect to any or all of the Offered Shares in accordance with Section 2.2, the Selling Stockholder, upon notice from Licensee of Licensee's decision not to accept the Offer as to any or all of the Offered Shares (or upon expiration of the fifteen-day option period referred to

EXHIBIT A

in Section 2.2 if Licensee fails to give notice as aforesaid), shall be deemed to have offered in writing to sell all, but not less than all, of its remaining Offered Shares (those not purchased by Licensee) to the Stockholders (other than the Selling Stockholder), as a group (*"Offeree Stockholders"*) at the price and upon the terms set forth in the Offer. For a period of fifteen (15) days after such Offer to the Offeree Stockholders, the Offeree Stockholders shall have the option, exercisable by written notice to the Selling Stockholder with a copy to Licensee and to each of the other Offeree Stockholders, to accept the Offer as to the remaining Offered Shares. Each Offeree Stockholder who exercises this option shall agree, by doing so, to purchase that proportionate part of the remaining Offered Shares which the number of Shares owned by such Offeree Stockholder bears to the total number of Shares owned by all Offeree Stockholders (or in such other proportions as the Offeree Stockholders may agree among themselves). In the event that one or more of the Offeree Stockholders does not exercise its option in accordance with Section 2.3, the Offeree Stockholders who exercised their options pursuant to Section 2.3 shall have a further option for a period of five (5) additional days following the expiration of the fifteen-day period set forth in Section 2.3 to accept the Offer as to the then remaining Offered Shares, and each such Offeree Stockholder who exercises this further option shall agree, by doing so, to purchase that proportionate part of the then remaining Offered Shares, which the number of Shares owned by such Offeree Stockholder bears to the total number of Shares owned by all of the Offeree Stockholders exercising their option pursuant to this Section 2.3 (or in such other proportions as such Offeree Stockholders may agree among themselves).

       2.4 <u>Sale to Third Party Purchaser</u>. If, at the end of the option periods described in Sections 2.2 and 2.3 (the *"Option Periods"*), options have not been exercised by Licensee and/or the Offeree Stockholders to purchase all of the Offered Shares, then the Licensee and the Offeree Stockholders shall not have the right to purchase any of the Offered Shares and the Selling Stockholder shall be free, subject to the co-sale provisions of Article 3, for a period of thirty (30) days thereafter to sell all of the Offered Shares to a third party purchaser (the *"Third Party Purchaser"*) at the price and upon the terms and conditions set forth in the Offer. If such Offered Shares are not so sold within the aforesaid thirty-day period, then the Selling Stockholder shall not be permitted to sell such Offered Shares without again complying with this Article 2.

ARTICLE 3 – CO-SALE PROVISIONS

       3.1 <u>Notice of Third-Party Offer</u>. Within five (5) days of the end of the Option Periods, if there are any Offered Shares available for sale to the Third Party Purchaser, the Selling Stockholder shall submit a written notice (the *"Co-Sale Notice"*) to the Offeree Stockholders disclosing the number of Offered Shares proposed to be sold and the total number of Shares owned by the Selling Stockholder.

       3.2 <u>Right of Participation in Sales</u>.

       (a) <u>Co-Sale Right</u>. Upon receipt of a Co-Sale Notice from the Selling Stockholder, each Offeree Stockholder shall have the right to sell to the Third Party Purchaser, at the same price per share and on the same terms and conditions set forth in the Offer, such number of Shares held by such Offeree Stockholder equal to the Offered Shares multiplied by a fraction, the numerator of which is the aggregate number of Shares held by such Offeree

**EXHIBIT A**

Stockholder and the denominator of which is the sum of: (i) all Shares held by such Selling Stockholder (excluding those, if any, Shares designated for sale to Licensee and the Offeree Stockholders pursuant to Article 2); and (ii) all of the Shares held by any Offeree Stockholder or Offeree Stockholders electing to participate in such sale to the Third Party Purchaser (such Stockholders being "*Participating Stockholders*"); provided, however, that the maximum number of shares which the Participating Shareholders may include in such sale shall not exceeed, and the minimum number of shares which the Selling Shareholder may include in such sale shall be not less than, fifty percent (50%) of the total number of shares to be purchased by the purchase offeror.

(b) <u>Notice of Intent to Participate</u>.  If an Offeree Stockholder wishes to participate in any sale under this Section 3.2, then such Offeree Stockholder shall notify the Selling Stockholder in writing of such intention as soon as practicable after such Offeree Stockholder's receipt of the Co-Sale Notice made pursuant to Section 3.1, and in any event within ten (10) days after the date of such Co-Sale Notice has been delivered.  Such notification shall be delivered in person or by facsimile to the Selling Stockholder.

(c) <u>Sale of Co-Sale Shares</u>.  The Selling Stockholder and the Participating Stockholders shall sell to the Third Party Purchaser all, or, at the option of the Third Party Purchaser, any part, of the Shares proposed to be sold by them at not less than the price and upon other terms and conditions, if any, not more favorable to the Third Party Purchaser than those in the Co-Sale Notice provided by the Selling Stockholder under Section  above; provided that any purchase of less than all of such shares by the Third Party Purchaser shall be made from the Selling Stockholder and the Participating Stockholders pro rata based upon the relative amount of the Shares that the Selling Stockholder and each of the Participating Stockholders is otherwise entitled to sell pursuant to Section 3.2(a).

## ARTICLE 4 – PRICE, TERMS AND SETTLEMENT

4.1 <u>Purchase Price</u>.  The purchase price per Share and the terms of payment shall be the price per Share contained in the Offer.

4.2 <u>Time; Date; Location</u>.  Settlement for the purchase of Shares by Licensee or by a Stockholder pursuant to the provisions of Article 2, shall be made within thirty (30) days following the date of exercise of the last option exercised.  All settlements for the purchase and sale of Shares shall, unless otherwise agreed to by all of the purchasers and sellers, be held at the principal executive offices of Licensee during regular business hours.  The precise date and hour of settlement shall be fixed by the purchaser or purchasers (within the time limits proscribed in this Agreement), or in the event the purchasers fail to agree, by the President of Licensee, by notice in writing to the seller given at least five (5) days in advance of the settlement date specified.

4.3 <u>Certificates</u>.  At settlement, the stock certificate or certificates representing the Shares being sold shall be delivered by the seller to the purchaser or purchasers, duly endorsed for transfer or with executed stock powers attached, with any necessary documentary and transfer tax stamps affixed by the seller, free and clear of all liens, claims and encumbrances except for the terms of this Stockholders Agreement.

EXHIBIT A

4.4 Authority. The seller, if a personal representative of a Stockholder, shall, upon request of a purchaser, provide prior to the date of settlement, evidence reasonably satisfactory to the purchaser of the seller's legal status as personal representative of such Stockholder.

## ARTICLE 5 – ADDITIONAL PROVISIONS

5.1 Copy of Agreement to Be Kept on File. Licensee shall keep on file at its principal executive offices, and will exhibit to any Stockholder or his or her duly authorized representative at any and all reasonable times, an executed copy of this Agreement and all amendments thereto.

5.2 Stock Certificates to Be Marked with Legend. All certificates hereafter issued by Licensee shall be marked with the following legend:

> THIS CERTIFICATE AND THE SECURITIES REPRESENTED
> HEREBY ARE HELD SUBJECT TO THE TERMS,
> COVENANTS AND CONDITIONS OF A STOCKHOLDERS
> AGREEMENT DATED AS OF NOVEMBER 16, 2001 BY AND
> AMONG CORMATRIX CARDIOVASCULAR, INC., AND ITS
> THEN STOCKHOLDERS, AS IT MAY BE AMENDED FROM
> TIME TO TIME, AND MAY NOT BE TRANSFERRED OR
> DISPOSED OF EXCEPT IN ACCORDANCE WITH THE
> TERMS AND PROVISIONS THEREOF. A COPY OF SAID
> AGREEMENT AND ALL AMENDMENTS THERETO IS ON
> FILE AND MAY BE INSPECTED AT THE PRINCIPAL
> EXECUTIVE OFFICES OF PHARMASSET, LTD.

5.3 Term of Agreement. Unless terminated sooner in accordance with the provisions of Section 5.6, this Agreement shall terminate upon the closing of an underwritten, firm commitment initial public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended, or any other securities law of any jurisdiction covering the offer and sale by Licensee of its Common Stock in which the aggregate net proceeds to Licensee exceed Twenty Million Dollars ($20,000,000.00) (a "*Qualified Initial Public Offering*").

5.4 Rights, Obligations and Remedies. The rights and obligations under, and the remedies to enforce, this Agreement are joint and several as to Licensee and each of its Stockholders with each being completely free to enforce any or all of the rights or obligations under this Agreement against any of the others with or without the concurrence or joinder of any of the others. The Shares are unique, and recognizing that the remedy at law for any breach or threatened breach by a party hereto of the covenants and agreements set forth in this Agreement would be inadequate and that any such breach or threatened breach would cause such immediate and permanent damage as would be irreparable and the exact amount of which would be impossible to ascertain, the parties hereto agree that in the event of any breach or threatened breach of any such covenant or agreement, in addition to any and all other legal and equitable remedies which may be available, any party hereto may specifically enforce the terms of this Agreement and may obtain temporary and/or permanent injunctive relief without the necessity of proving actual damage by reason of any breach or threatened breach of this Agreement and, to

EXHIBIT A

the extent permissible under the applicable statutes and rules of procedure, a temporary injunction may be granted immediately upon the commencement of any such suit and without notice.

       5.5 <u>Subsequent Stockholders to Become Bound</u>. Any person or entity who subsequently becomes a Stockholder of Licensee (including holders of options or warrants to acquire Common Stock upon the exercise of such option or warrant, as the case may be) shall be bound by all of the terms and provisions of, and shall be entitled to all the benefits and privileges of this Agreement. Before any person or entity not a party to this Agreement, including any person or entity to whom transfers of Shares may be made hereunder, may be entitled to become a Stockholder of Licensee, such person or entity shall be required first to execute and deliver to Licensee an agreement pursuant to which such person or entity agrees to be bound by all of the terms and conditions of this Agreement (as it may have then been amended), and the failure of any such person or entity to execute such agreement shall preclude such person or entity from becoming a Stockholder of Licensee.

       5.6 <u>Amendment, Modification and Termination</u>. This Agreement may be amended, modified or terminated, or any provision or requirement of this Agreement waived, at any time by an agreement in writing among Licensee PRF, the holders of a majority of outstanding Shares held by Additional Investors, and a majority of outstanding shares held by Founders. Any such amendment or waiver shall be effective with respect to all parties to this Agreement.

       5.7 <u>No Waiver.</u> No waiver of any breach or condition of this Agreement shall be deemed to be a waiver of any other or subsequent breach or condition, whether of like or different nature.

       5.8 <u>Governing Law and Jurisdiction</u>. This Agreement shall be governed by and interpreted under the laws of the State of Indiana, without giving effect to the principles of conflicts of law of any jurisdiction. In the event that a party to this Agreement perceives the existence of a dispute with the other party concerning any right or duty provided for in this Agreement, the parties will, as soon as practicable, confer in an attempt to resolve the dispute. If the parties are unable to resolve such dispute amicably, then the parties hereby submit to the exclusive jurisdiction of and venue in the state and federal courts located in Tippecanoe County, Indiana with respect to any and all disputes concerning the subject of, or arising out of, this Agreement, and such courts shall be the sole and exclusive jurisdiction and venue for any such disputes.

       5.9 <u>Notices</u> . All notices, requests, consents and other communications hereunder shall be in writing and shall be delivered in person or sent overnight delivery by Federal Express or via facsimile, and shall be deemed to have been given when hand delivered, one (1) business day after mailing when sent by overnight courier (e.g., Federal Express or Express Mail) or upon receipt by successfully transmitted by facsimile and confirmed by facsimile report, as follows (provided that notice of change of address shall be deemed given only when received):

**EXHIBIT A**

If to Licensee, to:

    David Camp
    CorMatrix Cardiovascular, Inc.
    14980 East Bluff Road.
    Alpharetta, GA 30004
    Fax: 770-751-3757

If to PRF, to:

    Lisa Kuuttila
    Office of Technology Commercialization
    Purdue Research Foundation, Inc.
    1291 Cumberland Avenue
    West Lafayette, Indiana   47906
    Fax: 765-496-1277

With a required copy to:

    General Counsel
    Thomas B. Parent
    Stuart & Branigin
    P.O. Box 1010
    Lafayette, IN  47902-1010
    Facsimile: (765) 742-5871

or to such other names or addresses as a party to this Agreement, as the case may be, shall designate by notice to each other person entitled to receive notices in the manner specified in this Section 5.9.

    5.10   <u>Binding Nature of Agreement and No Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns, except that no party may assign or transfer its rights or obligations under this Agreement without the prior written consent of the other parties hereto, except by means of transfers permitted by Article 1 or Article 2.

    5.11   <u>Counterparts, Headings and Exhibits</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  The headings used in this Agreement are for convenience only and are not to be considered in construing or interpreting any term or provision of this Agreement.  All Schedules and Exhibits hereto are hereby incorporated in this Agreement and made a part of this Agreement.

    5.12   <u>Integration</u>.  This Agreement, the Stock Purchase Agreement and the License Agreement embody the entire agreement and understanding among the parties hereto and thereto supersede all prior agreements and understandings relating to the subject matter hereof or thereof.

    5.13   <u>Severability</u>.   If any provision of this Agreement shall be held to be illegal, invalid or unenforceable, then such illegality, invalidity or unenforceability shall attach only to such provision and shall not in any manner affect or render illegal, invalid or

**EXHIBIT A**

unenforceable any other provision of this Agreement, and this Agreement shall be carried out as if any such illegal, invalid or unenforceable provision were not contained in this Agreement.

5.14    Number of Days. In computing the number of days for purposes of this Agreement, all days shall be counted, including Saturdays, Sundays and holidays; provided that if the final day of any time period falls on a Saturday, Sunday or holiday on which Federal banks are or may elect to be closed, then the final day shall be deemed to be the next day which is not a Saturday, Sunday or such holiday.

*(signature page follows)*

        IN WITNESS WHEREOF, the parties hereto have executed and delivered this
Agreement on the date first above written.

CORMATRIX CARDIOVASCULAR, INC.          THE STOCKHOLDERS

By: _David B Camp_                      PURDUE RESEARCH FOUNDATION, INC.

Name: _DAVID B. CAMP_                    By: _Martin C. Jischke_

Title: _PRESIDENT / CEO_                 Name: _MARTIN C. JISCHKE_

                                        Title: _President_

                                        CORMATRIX HOLDINGS, INC.

                                        By: _David B Camp_

                                        Name: _DAVID B. CAMP_

                                        Title: _PRESIDENT / CEO_

                                                                    **EXHIBIT A**

## <u>SCHEDULE A</u>

1.      <u>Additional Investors</u>

None

2.      Founding Stockholders

CorMatrix Holdings, Inc.                    97,500 shares

EXHIBIT A

200 North Cobb Parkway, Suite 140
Marietta, GA 30062
Phone: 770-514-0077
Fax: 770-424-8236



**CorMatrix
Cardiovascular, Inc.**

# Fax

| To: | Robert LaDuca | From: | John C Thomas |
|---|---|---|---|
| **Fax:** | 831-420-1196 | **Pages:** | 28 |
| **Phone:** | 831-425-0682 | **Date:** | 2/9/2004 |
| **Re:** | | **CC:** | |

☐ **Urgent**   ☐ **For Review**   ☐ **Please Comment**   ☐ **Please Reply**   ☐ **Please Recycle**

● **Comments:**

Attached is the subscription document related to the investment in CorMatrix Cardiovascular. I understand from Dr. Matheny that your investment may come in two traunches, one for $300,000 and one for $50,000. If you would like two separate certificates, please complete two separate subscription documents, otherwise one will suffice and I will prepare one certificate for the entire investment.

I have attached a short capitalization table which was used to determine the stock price and the number of shares that you will be receiving for the $350,000 investment which will represent an ownership of 20% of CorMatrix Cardiovascular.

Also attached is the stockholders agreement related to Purdue which you by becoming a shareholder of CorMatrix become a party to as well. If you have any questions regarding this agreement, please do not hesitate to contact me at 770-514-0077.

The wiring instructions for the investment are as follows:

|  |  |
|---|---|
| Bank | Main Street Bank |
| Address: | Covington, GA 30015 |
| Phone number: | 770-385-2510 |
| ABA number: | 061102277 |
| For Further Credit to: | CorMatrix Cardiovascular, Inc. |
| Account Number: | 53992 |

We look forward to having you as a shareholder and meeting with you in the coming weeks.

EXHIBIT A