# EXHIBIT A

FEB. -09' 04 (MON) 09:47                                        TEL:1 770 424 8236                    P. 001

200 North Cobb Parkway, Suite 140
Marietta, GA 30062
Phone: 770-514-0077
Fax: 770-424-8236

**CorMatrix Cardiovascular, Inc.**

# Fax

| To: | Robert LaDuca | From: | John C Thomas |
|---|---|---|---|
| Fax: | 831-420-1196 | Pages: | 28 |
| Phone: | 831-425-0882 | Date: | 2/9/2004 |
| Re: | | CC: | |

☐ **Urgent**   ☐ **For Review**   ☐ **Please Comment**   ☐ **Please Reply**   ☐ **Please Recycle**

● **Comments:**

Attached is the subscription document related to the investment in CorMatrix Cardiovascular. I understand from Dr. Matheny that your investment may come in two traunches, one for $300,000 and one for $50,000. If you would like two separate certificates, please complete two separate subscription documents, otherwise one will suffice and I will prepare one certificate for the entire investment.

I have attached a short capitalization table which was used to determine the stock price and the number of shares that you will be receiving for the $350,000 investment which will represent an ownership of 20% of CorMatrix Cardiovascular.

Also attached is the stockholders agreement related to Purdue which you by becoming a shareholder of CorMatrix become a party to as well. If you have any questions regarding this agreement, please do not hesitate to contact me at 770-514-0077.

The wiring instructions for the investment are as follows:

| | |
|---|---|
| Bank | Main Street Bank |
| Address: | Covington, GA 30015 |
| Phone number: | 770-385-2510 |
| ABA number: | 061102277 |
| For Further Credit to: | CorMatrix Cardiovascular, Inc. |
| Account Number: | 53992 |

We look forward to having you as a shareholder and meeting with you in the coming weeks.

Swift code!

CorMatrix Cardiovascular, Inc.
Capitalization Table

|  | Existing | | Proposed | |
|---|---|---|---|---|
|  | Shares | Percentage | Shares | Percentage |
| Founders | 97,500 | 97.50% | 97,500 | 77.50% |
| Purdue Research Foundation | 2,500 | 2.50% | 3,145 | 2.50% |
| New Investor |  |  | 25,161 | 20.00% |
| Total | 100,000 | 100.00% | 125,806 | 100.00% |

Cap Table for New Investor

Name of Subscriber: _____

## SUBSCRIPTION AGREEMENT

CorMatrix Cardiovascular, Inc.
14980 East Bluff Road
Alpharetta, Georgia 30004

### ARTICLE 1    Subscription

Section 1.1    Subscription.  The undersigned hereby irrevocably subscribes for and agrees to purchase shares of the Common Stock, par value $0.001 per share (the "Common Stock") of CorMatrix Cardiovascular, Inc., a Georgia corporation (the "Company"), at a price of $11.9232 per share and in the amount set forth below and on the terms and conditions described in this subscription agreement (this "Subscription Agreement") dated as of February 9, 2004

**Amount And Dollar Value Of**                    _____ shares

**Common Stock Subscribed For:**                    $_____

THE UNDERSIGNED IS REQUIRED TO CHECK THE APPROPRIATE BOX ON THE ACCREDITED INVESTOR CERTIFICATION FOUND ON PAGE 7 HEREOF TO CERTIFY HIS, HER OR ITS STATUS AS AN ACCREDITED INVESTOR.

Section 1.2    Payment.  The undersigned agrees to wire as soon as practicable, but in any event not later than February 11, 2004, in immediately available funds, to the account of the Company in the amount indicated in Section 1.1 above.  Wire transfers in the amount indicated above shall be made to the account and account name as previously provided.

Section 1.3    Acceptance or Rejection.  The undersigned understands that the Company will accept this subscription (and only with respect to it) only by executing and delivering this Subscription Agreement and Stockholders' Agreement.  The undersigned acknowledges that the undersigned may not withdraw this subscription.

In the event that this subscription is rejected in part by the Company, there shall be returned to the undersigned the difference between the subscription amount paid to it and the subscription price allocable to the amount of the Common Stock accepted.  In the event this subscription is rejected in its entirety, the subscription amount paid will be promptly returned to the undersigned without deduction and without interest, and this Subscription Agreement shall have no force or effect.

**Section 1.4    Other Subscription Agreements; Closings.** The certificate representing the Common Stock purchased together with copies of the executed Stockholders' Agreement Subscription Agreement will be delivered to you promptly after the closing.

## ARTICLE 2    Investor Representations and Warranties

The undersigned makes the following representations and warranties with the intent that the same may be relied upon by the Company:

**Section 2.1    Information.** The undersigned acknowledges that the undersigned has been offered the opportunity to obtain information, to verify the accuracy of the information received by him, her or it and to evaluate the merits and risks of this investment and to ask questions of and receive satisfactory answers concerning the terms and conditions of this investment. The undersigned has received copies of such documents and information as he, she or it has deemed necessary in order to make an informed investment decision with respect to the investment being made hereby and the Company has made its officers available to the undersigned to answer questions concerning the Company and the investment being made hereby. In making the decision to purchase the Common Stock, the undersigned has relied and will rely solely upon independent investigations made by him, her or it. The undersigned is not relying on the Company with respect to any tax or other economic considerations involved in this investment. Other than as set forth in Article III hereof, no representations or warranties have been made to the undersigned by the Company. To the extent the undersigned has deemed it appropriate, the undersigned has consulted with his, her or its own attorneys and other advisors with respect to all matters concerning this investment.

**Section 2.2    Not a Registered Offering.** The undersigned understands that the Common Stock has not been and is not being registered either with the Securities and Exchange Commission ("SEC") nor with the governmental entity charged with regulating the offer and sale of securities under the securities laws and regulations of the state of residence of the undersigned and are being offered and sold pursuant to the exemption from registration provided in Section 4(2) of the Securities Act of 1933, as amended (the "1933 Act"), and Rule 506 of Regulation D ("Regulation D") promulgated under the 1933 Act by the SEC and limited exemptions provided in the "Blue Sky" laws of the state of residence of the undersigned and that no governmental agency has recommended or endorsed the Securities or made any finding or determination relating to the fairness for investment of the Common Stock. The undersigned is unaware of, and is in no way relying on, any form of general solicitation or general advertising in connection with the offer and sale of the Common Stock. The undersigned is purchasing the Common Stock without being furnished any offering or sales literature or prospectus.

**Section 2.3    Purchase for Investment.** The undersigned is subscribing for the Common Stock solely for his, her or its own account for investment purposes and not with a view to, or with any intention of, a distribution, sale or subdivision for the account of any other individual, corporation, firm, partnership, limited liability company, joint venture, association or person.

**Section 2.4**   <u>Accredited Investor and other Investment Representations</u>.   The undersigned represents and warrants that the undersigned is an "accredited investor" as defined in Rule 501(a) of Regulation D under the 1933 Act and that the undersigned has accurately completed the Accredited Investor Certification, which precedes the signature page to this Subscription Agreement.

**Section 2.5**   <u>Restrictions on Transfer</u>

(a)   The undersigned understands and agrees that because the offer and sale of the Common Stock subscribed for herein have not been registered under federal or state securities laws, the Securities acquired may not at any time be sold or otherwise disposed of by the undersigned unless they are registered under the 1933 Act or there is applicable to such sale or other disposition one of the exemptions from registration set forth in the 1933 Act, the rules and regulations of the SEC thereunder and applicable state law. The undersigned further understands that the Company has no obligation or present intention to register the Common Stock or to permit its sale other than in strict compliance with the 1933 Act, SEC rules and regulations thereunder, and applicable state law. The undersigned recognizes that, as a result of the aforementioned restrictions, there is not and will be no public market for the Common Stock subscribed for hereunder. The undersigned expects to hold the Common Stock for an indefinite period and understands that the undersigned will not readily be able to liquidate this investment even in case of an emergency.

(b)   The undersigned has received and read a copy of the Stockholders Agreement among and understands the restrictions on transfer contained therein. As a condition to the issuance of the Common Stock to the undersigned, the undersigned agrees to become a party to the Stockholders Agreement.

(c)   All certificates representing the Common Stock to be issued to the undersigned pursuant to this Agreement shall have endorsed thereon legends substantially as follows:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAW AND MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT COVERING THESE SECURITIES UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER THE ACT OR UNDER APPLICABLE STATE SECURITIES LAWS."

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE PROVISIONS OF A STOCKHOLDERS AGREEMENT DATED NOVEMBER 16, 2001 AMONG THE COMPANY AND THE OTHER PARTIES THERETO, A COPY OF WHICH AGREEMENT IS AVAILABLE FOR INSPECTION AT THE OFFICES OF THE COMPANY OR WILL BE MADE AVAILABLE UPON REQUEST."

Section 2.6   __Investment Risks__.  The undersigned has such knowledge and experience in financial and business matters that he, she or it is capable of evaluating the merits and risks of an investment in the Common Stock.  The undersigned recognizes that the Company is newly organized and is a development stage company with extremely limited financial and operating history, and that an investment in the Company involves very significant risks.  The undersigned further recognizes that (A) an investment in the Company is highly speculative, (B) an investor may not be able to liquidate his, her or its investment, (C) transferability of the Common Stock is extremely limited, (D) in the event of a disposition, the investor could sustain a loss of his, her or its entire investment, (E) the Company will require significant additional financing in order to continue its business, (F) the Company has never had any revenues and is not expected to have any revenues for the foreseeable future, and (G) the Company likely will need to raise additional funds in the near future through the sale of equity, and that any such sale may  be on terms to investors that are more favorable than the terms to the undersigned.  The undersigned is capable of bearing the economic risks of an investment in the Common Stock, including, but not limited to, the possibility of a complete loss of the undersigned's investment, as well as limitations on the transferability of the Common Stock, which may make the liquidation of an investment in the Common Stock difficult or impossible for the indefinite future.

Section 2.7   __Residence__.  The undersigned, if a natural person, is a bona fide resident of the state set forth in his or her address on the signature page to this Subscription Agreement.  The undersigned, if an entity, has its principal place of business at the mailing address set forth on the signature page of this Subscription Agreement.

Section 2.8   __Investor Information; Survival of Representations and Warranties__.  The representations, warranties and agreements contained in this Article II shall survive the date hereof.  Any information that the undersigned is furnishing to the Company in this Subscription Agreement is correct and complete as of the date of this Subscription Agreement and if there should be any material change in such information prior to his, her or its admission as a stockholder of the Company, the undersigned will immediately furnish such revised or corrected information to the Company.

Section 2.9   __Due Organization__.  If the undersigned is a corporation, partnership or limited liability company, the undersigned is duly organized, validly existing and in good standing under the jurisdiction of its organization, has all requisite power and authority to own, lease and operate its properties, to carry on its business as currently being conducted, to enter into this Subscription Agreement and to perform its obligations hereunder and thereunder.

Section 2.10   __Due Authorization__.  If the undersigned is a corporation, partnership or limited liability company, the execution, delivery and performance by the undersigned of this Subscription Agreement and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of the undersigned.

Section 2.11   __Capacity__.  If the undersigned is an individual, the undersigned has the capacity to execute, deliver and perform this Subscription Agreement.

Section 2.12 <u>Enforceability</u>. This Subscription Agreement is, or upon its execution and delivery will be, a valid and binding obligation of the undersigned, enforceable against the undersigned in accordance with its terms.

Section 2.13 <u>No Conflicts</u>. Neither the execution, delivery nor performance by the undersigned of this Subscription Agreement, nor the consummation by the undersigned of the transactions contemplated hereby will (A) conflict with or result in a breach of any provision of the undersigned's certificate of incorporation, bylaws or other organizational documents, (B) cause a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any agreement, instrument or obligation to which the undersigned is a party or (C) violate any law, statute, rule, regulation, judgment, order, writ, injunction or decree of any court, administrative agency or governmental body, in each case applicable to the undersigned or its properties or assets.

Section 2.14 <u>No Approvals</u>. No filing with, and no permit, authorization, consent or approval of, any person (governmental or private) is necessary for the consummation by the undersigned of the transactions contemplated by this Subscription Agreement.

Section 2.15 <u>Brokerage Commissions and Finders' Fees</u>. Neither the undersigned, nor anyone acting on the undersigned's behalf, has taken any action which has resulted, or will result, in any claims for brokerage commissions or finders' fees by any person in connection with the transactions contemplated by this Subscription Agreement.

## ARTICLE 3   Company Representations and Warranties

The Company makes the following representations and warranties with the intent that the same may be relied upon by the undersigned:

Section 3.1 <u>Due Organization</u>. The Company is a corporation duly organized, validly existing and in good standing under the jurisdiction of its organization, has all requisite power and authority to own, lease and operate its properties, to carry on its business as currently being conducted, to enter into this Subscription Agreement and to perform its obligations hereunder.

Section 3.2 <u>Due Authorization</u>. The execution, delivery and performance by the Company of this Subscription Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Company.

Section 3.3 <u>Enforceability</u>. This Subscription Agreement is, or upon its execution and delivery will be, a valid and binding obligation of the Company, enforceable against the Company in accordance with its respective terms.

Section 3.4 <u>No Conflicts</u>. Neither the execution, delivery nor performance by the Company of this Subscription Agreement, nor the consummation by the Company of the transactions contemplated hereby, will (A) conflict with or result in a breach of any provision of the Company's certificate of incorporation or by-laws, (B) cause a default (or give rise to any

right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any agreement, instrument or obligation to which the Company is a party or (C) violate any law, statute, rule, regulation, judgment, order, writ, injunction or decree of any court, administrative agency or governmental body, in each case applicable to the Company or its properties or assets.

Section 3.5    No Approvals. Assuming the accuracy of the representations contained in Article II, no filing with, and no permit, authorization, consent or approval of, any person (governmental or private) is necessary for the consummation by the Company of the transactions contemplated by this Subscription Agreement, other than filings under Federal and state securities laws.

## ARTICLE 4    Miscellaneous Provisions

Section 4.1    Notices And Addresses. All notices required to be given under this Subscription Agreement shall be in writing and shall be mailed by certified or registered mail, hand delivered or delivered by next business day courier. Any notice to be sent to the Company shall be mailed to the principal place of business of the Company or at such other address as the Company may specify in a notice sent to the undersigned. All notices to the undersigned shall be mailed or delivered to the address set forth on the signature page to this Subscription Agreement or to such other address as the undersigned may hereafter notify the Company of in writing. Notices shall be effective on the date three days after the date of mailing or, if hand delivered or delivered by next day business courier, on the date of delivery, provided, however, that notices to the Company shall be effective upon receipt.

Section 4.2    Governing Law; Jurisdiction. (A) THIS SUBSCRIPTION AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF GEORGIA WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES, (B) THE UNDERSIGNED HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY GEORGIA STATE COURT OR UNITED STATES FEDERAL COURT SITTING IN THE STATE OF DELAWARE, OVER ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SUBSCRIPTION AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY, AND (C) THE UNDERSIGNED HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH GEORGIA STATE OR FEDERAL COURT. THE UNDERSIGNED FURTHER WAIVES ANY OBJECTION TO VENUE IN SUCH COURT AND ANY OBJECTION TO AN ACTION OR PROCEEDING IN SUCH COURT ON THE BASIS OF A NON-CONVENIENT FORUM. THE UNDERSIGNED FURTHER AGREES THAT ANY ACTION OR PROCEEDING BROUGHT AGAINST THE COMPANY SHALL BE BROUGHT IN SUCH COURTS. THE UNDERSIGNED AGREES TO WAIVE ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS SUBSCRIPTION AGREEMENT OR ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY.

Section 4.3    <u>Assignability</u>.  This Subscription Agreement and the rights, interests and obligations hereunder are not transferable or assignable by the undersigned and the undersigned acknowledges and agrees that any transfer or assignment of the Common Stock shall be made only in accordance with all applicable laws.

Section 4.4    <u>Successors And Assigns</u>.  This Subscription Agreement shall be binding upon and inure to the benefit of the parties hereto, and each of their respective legal representatives and permitted successors.

Section 4.5    <u>Counterparts</u>.  This Subscription Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one instrument.

Section 4.6    <u>Modifications To Be In Writing</u>.  This Subscription Agreement constitutes the entire understanding of the parties hereto with respect to the subject matter hereof and no amendment, restatement, modification or alteration will be binding unless the same is in writing signed by the party against whom any such amendment, restatement, modification or alteration is sought to be enforced.

Section 4.7    <u>Captions</u>.  The captions are inserted for convenience of reference only and shall not affect the construction of this Subscription Agreement.

Section 4.8    <u>Validity And Severability</u>.  If any provision of this Subscription Agreement is held invalid or unenforceable, such decision shall not affect the validity or enforceability of any other provision of this Subscription Agreement, all of which other provisions shall remain in full force and effect.

Section 4.9    <u>Statutory References</u>.  Each reference in this Subscription Agreement to a particular statute or regulation, or a provision thereof, shall be deemed to refer to such statute or regulation, or provision thereof, or to any similar or superseding statute or regulation, or provision thereof, as is from time to time in effect.

******

## Accredited Investor Certification

**YOU MUST BE ABLE TO CHECK OFF AT LEAST ONE OF THE BOXES BELOW IN ORDER TO PURCHASE COMMON STOCK**

☐ The undersigned is a natural person who had individual income of more than $200,000 in each of the most recent years or joint income with his spouse in excess of $300,000 in each of the most recent two years and reasonably expects to reach that same income level for the current year ("income"), for purposes hereof, should be computed as follows: individual adjusted gross income, as reported (or to be reported) on a federal income tax return, increased by (a) any deduction of long-term capital gains under section 1202 of the Internal Revenue Code of 1986 (the "Code"), (b) any deduction for depletion under Section 611 et seq. of the Code, (c) any exclusion for interest under Section 103 of the Code and (d) any losses of a partnership as reported on Schedule E of Form 1040);

☐ The undersigned is a natural person whose individual net worth (i.e., total assets in excess of total liabilities), or joint net worth with his spouse, will at the time of purchase of the Common Stock be in excess of $1,000,000;

☐ The Purchaser is a corporation, Massachusetts or similar business trust, partnership, or limited liability company, or any organization described in Section 501(c)(3) of the Internal Revenue Code, not formed for the specific purpose of acquiring the Common Stock, with total assets in excess of $5,000,000;

☐ The undersigned is a trust (other than a revocable grantor trust), which trust has total assets in excess of $5,000,000, which is not formed for the specific purpose of acquiring the Common Stock offered hereby and whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D and who has such knowledge and experience in financial and business matters that he is capable of evaluating the risks and merits of an investment in the Common Stock;

☐ The undersigned is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, and either (a) the investment decision will be made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, insurance company, or a registered investment adviser; or (b) the employee benefit plan has total assets in excess of $5,000,000; or (c) the employee benefit plan is a self-directed plan, including an Individual Retirement Account, with the meaning of Title I of such act, and the person directing the purchase is an Accredited Investor**;

**NOTE.** If the undersigned is relying solely on this item for its Accredited Investor status, please print the name of the person directing the purchase in the following space and furnish a completed and signed Accredited Investor Certification for such person.

☐ The undersigned is an investor otherwise satisfying the requirements of Section 501(a)(1), (2) or (3) of Regulation D promulgated under the 1933 Act, which includes but is not

limited to, a self-directed employee benefit plan where investment decisions are made solely by persons who are "accredited investors" as otherwise defined in Regulation D;

☐     The undersigned is a member of the Board of Directors or an executive officer of the Company; or

☐     The undersigned is an entity (including an IRA or revocable grantor trust but other than a conventional trust) in which all of the equity owners meet the requirements of at least one of the above subparagraphs.

FEB. -09' 04 (MON) 09:51                    TEL:1 770 424 8236                P. 012

## SUBSCRIPTION AGREEMENT
## SIGNATURE PAGE

If the subscriber is an INDIVIDUAL, or if purchased as JOINT TENANTS, as TENANTS IN COMMON, or a COMMUNITY PROPERTY:

_____          _____
Print Name(s)                             Social Security Number(s)

_____          _____
Signature(s) of subscriber(s)             Signature(s) of subscriber(s)

_____          Address:  _____
Date                                                _____
                                                    _____

If the subscriber is a PARTNERSHIP, CORPORATION, LLC or TRUST:

_____          _____
Name of Entity                            Federal Taxpayer ID Number

By:_____
Name: _____          _____
Title: _____          State of Organization

_____          Address:  _____
Date                                                _____
                                                    _____

SUBSCRIPTION ACCEPTED AND AGREED TO this ___ day of _____ 2004.

CorMatrix Cardiovascular, Inc.


By:_____
Name: _____
Title: _____

# STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this "*Agreement*") is made on November 16, 2001, by and between CorMatrix Cardiovascular, Inc, a Georgia corporation with its principal place of business located at 14980 East Bluff Road, Alpharetta, Georgia 30004 ("*Licensee*"), and Purdue Research Foundation, Inc., an Indiana nonprofit corporation with offices located at the 1291 Cumberland Avenue, West Lafayette, Indiana 47906 ("*PRF*").

## BACKGROUND

A.     Concurrently with the execution of this Agreement, PRF is entering into a License Agreement with Licensee dated November 16, 2001 (the "*License Agreement*"), whereby PRF is licensing to Licensee certain technology owned by PRF;

B.     In partial consideration for the execution and delivery of the License Agreement by PRF, Licensee has agreed to issue to PRF certain shares of Licensee's capital stock in accordance with the terms and conditions of this Agreement; and

C.     Commencing with the execution of this Agreement, PRF is entering into a Stockholders Agreement with Licensee and its stockholders, dated November 16, 2001 ("*Stockholders Agreement*"), whereby Licensee and its stockholders provide for certain rights and obligations on the future disposition of Licensee's capital stock.

NOW, THEREFORE, in consideration of the premises and mutual promises and covenants contained in this Agreement, and intending to be legally bound hereby, the parties hereby agree as follows.

## ARTICLE 1 – PURCHASE OF SHARES

1.1 Purchase. In partial consideration for the execution and delivery of the License Agreement by PRF, Licensee hereby agrees to sell and issue to PRF such number of shares (the "*Purchased Shares*") of Licensee's common stock, par value $.001 per share ("*Common Stock*"), as will cause PRF to own shares of Common Stock representing at least Two and one-half percent (2.5%) of the outstanding shares of the capital stock of Licensee on a fully diluted basis, assuming the exercise, conversion and/or exchange of all outstanding securities of Licensee for or into shares of Common Stock, on the terms and conditions as hereinafter set forth.

1.2 Closing. The purchase and sale of the Purchased Shares shall occur contemporaneously with the execution and delivery of the License Agreement at a closing (the "*Closing*") to be held at a time (the "*Closing Date*") and place agreed upon by the parties. At the Closing, PRF shall deliver to Licensee an executed copy of each of this Agreement, the License Agreement and the Stockholders Agreement (collectively, the "*Transaction Documents*") and such other documents as Licensee may reasonably require, and Licensee shall deliver to PRF a fully executed copy of each of the Transaction Documents and such other documents as PRF may reasonably require and a stock certificate or certificates representing the Purchased Shares.

1.3 <u>Additional Purchases</u>. In partial consideration for the execution and delivery of the License Agreement by PRF, up to the time and amount at which Licensee has received a cumulative funding in the minimum amount of Three Million Dollars ($3,000,000.00) cash in equity financing, Licensee shall issue to PRF, for no additional consideration, from time to time, such number of additional shares of Common Stock (collectively, the *"Additional Purchased Shares"*) as will cause PRF to continue to hold shares of Common Stock representing at least Two and one-half percent (2.5%) of the outstanding capital stock of Licensee on a fully diluted basis, assuming the exercise, conversion and/or exchange of all outstanding securities of Licensee for or into shares of Common Stock. If Licensee's initial equity funding exceeds $3,000,000, then PRF's aforestated right to receive additional capital stock of Licensee will not apply to any funding in excess of the cumulative amount of $3,000,000. Each purchase and sale of any Additional Purchased Shares shall occur at a time and place designated by Licensee, at which PRF shall deliver to Licensee such documents as Licensee may reasonably require and Licensee shall deliver to PRF a stock certificate or certificates representing such Additional Purchased Shares.

1.4 <u>Closing Documents</u>. Within thirty (30) days after the Closing and, similarly, within thirty (30) days after any subsequent closing of each additional purchase pursuant to Section 1.3, Licensee will deliver to PRF an indexed, bound set consisting of a true and complete copy of the Transaction Documents, together with all applicable exhibits, schedules and attachments, and all other documents executed and/or delivered in connection with such closing.

## ARTICLE 2 – REPRESENTATIONS, WARRANTIES AND COVENANTS

2.1 <u>Representations and Warranties of Licensee</u>. Licensee hereby represents and warrants to PRF as follows:

(a) **Organization and Good Standing**. Licensee is a corporation duly organized, validly existing and in good standing under the laws of Georgia and has all requisite corporate power and corporate authority to carry on its business as now conducted and as proposed to be conducted.

(b) **Capitalization**. The capital stock Licensee is authorized to issue, and the beneficial ownership of the shares of each class and series thereof and of the securities convertible, exercisable or exchangeable therefor that will be outstanding upon consummation of the Closing, are as set forth on Exhibit A. No other person has any right of first refusal or any preemptive rights in connection with the issuance of the Purchased Shares or the Additional Purchased Shares (collectively, the *"Shares"*) or with respect to any future offer, sale or issuance of securities by Licensee.

(c) **Articles of Incorporation**. A true and complete copy of Licensee's Articles of Incorporation is attached hereto as Exhibit B.

(d) **Subsidiaries**. Licensee has not ever owned or controlled and does not presently own or control, directly or indirectly, any capital stock or other direct or indirect ownership interest in any other corporation, partnership, limited liability company or partnership, association or other business entity.

(e) **Authorization.** All corporate action on the part of Licensee, its officers, directors and shareholders necessary for the authorization, execution and delivery of the Transaction Documents and the transactions contemplated thereby, the performance of all obligations of Licensee under the Transaction Documents and the authorization, issuance and delivery of the Shares pursuant to this Agreement has been taken. Each of the Transaction Documents constitutes the valid and legally binding obligation of Licensee enforceable in accordance with its terms.

(f) **Valid Issuance of the Shares.** The Shares, when issued, sold and delivered in accordance with the terms of this Agreement, will be: duly and validly issued, fully paid and nonassessable; free of any liens, options, encumbrances, proxies, adverse claims or restrictions; and, assuming the accuracy of PRF's representations in this Agreement at the time of each such issuance, issued in compliance with all applicable federal and state securities laws. Issuance of the Shares is not subject to preemptive or any similar rights of Licensee or others.

(g) **Governmental Consents.** No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state, or local governmental authority (other than filings required to be made under applicable Federal and State securities laws) on the part of Licensee is required in connection with the authorization, execution, delivery of the Transaction Documents and performance of all obligations of Licensee under the Transaction Documents, and the authorization, issuance and delivery of the Shares pursuant to this Agreement.

(h) **Litigation.** There is no action, suit, proceeding or investigation pending or, to Licensee's knowledge, threatened against Licensee.

(i) **No Conflict with Other Instruments.** Licensee is not in violation or default of any provisions of Licensee's Certificate of Incorporation, Bylaws or other charter documents (collectively, the "*Charter Documents*") or of any instrument, judgment, order, writ, decree or contract to which Licensee is a party or by which Licensee is bound or of any provision of any statute, rule or regulation applicable to Licensee. The execution, delivery and performance of this Agreement will not result in any violation of, be in conflict with, or constitute a default under, with or without the passage of time or the giving of notice: (i) any provision of the Charter Documents; (ii) any provision of any judgment, decree or order to which Licensee is a party or by which Licensee is bound; (iii) any material contract, obligation or commitment to which Licensee is a party or by which Licensee is bound; or (iv) any statute, rule or regulation applicable to Licensee.

(j) **Absence of Claims.** There are no actions, suits, claims, investigations or legal or administrative proceedings pending or, to the best of Licensee's knowledge and belief, threatened, against Licensee, and there are no judgments, decrees or orders of any court, or government department, commission or agency entered or existing against Licensee or any of its assets or properties;

(k) **Solvency.** Licensee has not admitted in writing its inability to pay its debts generally as they become due, filed or consented to the filing against it of a petition in bankruptcy or a petition to take advantage of any insolvency act, made an assignment for the

CorMatrix.stockpurchase (1).doc                    3                    11/16/01

benefit of creditors, consented to the appointment of a receiver for itself or for the whole or any substantial part of its property, or had a petition in bankruptcy filed against it, been adjudicated a bankrupt, or filed a petition or answer seeking reorganization or arrangement under the federal bankruptcy laws or any other laws or of the United States or any other jurisdiction.

(l)  **Registration Rights.** Except as provided for in this Agreement, Licensee is not a party to any agreement or commitment that obligates Licensee to register under the Securities Act of 1933, as amended (the "*1933 Act*"), or under any applicable securities law in any jurisdiction, any of Licensee's presently outstanding securities or any of Licensee's securities that may hereafter be issued.

(m)  **Compliance with Securities Laws.** The offer, grant, sale, and/or issuance of the Shares will not be in violation of the 1933 Act, the Securities and Exchange Act of 1934, as amended, any state securities or "blue sky" law, any applicable securities law in any jurisdiction or the Charter Documents, when offered, sold and issued in accordance with this Agreement.

(n)  **Transfer Restrictions.** There are no restrictions on the transfer of capital stock of Licensee imposed by the Charter Documents, any agreement to which Licensee is a party (other than those agreements expressly contemplated by this Agreement), any order of any court or any governmental agency to which Licensee is subject, or any statute other than those imposed by relevant state and federal securities laws.

(o)  **Related Party Transactions.** There are no agreements, understandings or proposed transactions between Licensee and any of its officers, directors or other "affiliates" (as defined in Rule 405 promulgated under the 1933 Act) other than arm's length transactions concluded at market rates.

(p)  **No Broker.** No finder, broker, agent, financial advisor or other intermediary has acted on behalf of Licensee in connection with the offering or sale of the Shares or the negotiation or consummation of this Agreement or any of the transactions contemplated hereby.

(q)  **Full Disclosure.** Licensee has provided PRF with all of the information that PRF has requested for deciding whether to purchase the Shares. None of the Transaction Documents or any other disclosures, documents or certificates made or delivered in connection therewith, as of the date hereof or thereof, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not misleading.

2.2 <u>Covenants of Licensee.</u> Licensee covenants to PRF as follows:

(a)  **Corporate Existence.** Licensee shall maintain Licensee's corporate existence and qualification and make no material change (directly or through subsidiaries) in the present nature of Licensee's business. Licensee shall not amend its Certificate of Incorporation without the prior written consent of PRF, if such amendment would adversely effect the rights of PRF as a stockholder of Licensee; provided that any amendments by the Board of Directors of

Licensee to designate the preferences, limitations, and relative rights of one or more series of preferred stock shall not require the approval of PRF.

(b) **Rule 144 Compliance.** With a view to making available the benefits of certain rules and regulations of the Commission which may at any time permit the sale of the shares to the public without registration, at all times after ninety (90) days after any registration statement covering a public offering of securities of Licensee under the 1933 Act shall have become effective, Licensee agrees to: (i) make and keep public information available, as those terms are understood and defined in Rule 144 under the 1933 Act; (ii) use its best efforts to file with the Commission (as hereinafter defined) in a timely manner all reports and other documents required of Licensee under the 1933 Act and the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"); (iii) furnish to each holder of Registrable Securities (as hereinafter defined) forthwith upon request a written statement by Licensee as to Licensee's compliance with the reporting requirements of Rule 144 and of the 1933 Act and the Exchange Act, a copy of the most recent annual or quarterly report of Licensee, and such other reports and documents so filed by Licensee as such holder may reasonably request in availing itself of any rule or regulation of the Commission allowing such holder to sell any Registrable Securities without registration; and (iv) use Licensee's best efforts to satisfy the requirements of all such rules and regulations (including the requirements for current public information, registration under the Exchange Act and timely reporting to the Commission) at the earliest possible date after its first registered public offering.

2.3 <u>Representations and Warranties of PRF</u>. PRF hereby represents and warrants to Licensee as follows:

(a) **Investment Intent.** PRF is purchasing the Shares for PRF's own account for investment and not with a view to, or for sale in connection with, any distribution of the Shares or any portion thereof and not with any present intention of selling, offering to sell or otherwise disposing of or distributing the Shares or any portion thereof in any transaction other than a transaction exempt from registration under the 1933 Act.

(b) **Information Concerning Licensee.** PRF has had an opportunity to discuss with officers and directors of Licensee the plans, operations and financial condition of Licensee and has received all such information as PRF has deemed necessary and appropriate to enable PRF to evaluate the financial risk inherent in making an investment in the Shares.

(c) **Economic Risk.** PRF is able, without impairing its financial condition, to hold the Shares for an indefinite period of time and to suffer a complete loss of PRF's investment.

(d) **No Broker.** No finder, broker, agent, financial advisor or other intermediary has acted on behalf of PRF in connection with the offering of the Shares or the negotiation or consummation of this Agreement or any of the transactions contemplated hereby.

2.4 <u>Acknowledgments of PRF</u>. PRF hereby acknowledges to Licensee that the Shares have not been registered under the 1933 Act and are characterized as "restricted securities" under the 1933 Act and applicable regulations. PRF further acknowledges that the

Shares have not been registered under the securities laws of the state of Georgia, and are being offered and will be issued and sold in reliance upon an exemption afforded thereby.

## ARTICLE 3 – TRANSFERS

3.1 _Restrictions on Transfer_. PRF shall not sell, transfer, assign, pledge, hypothecate or otherwise dispose of any of the Shares unless and until:

(a) one of the following events shall have occurred:

(i)      Licensee has a class of securities registered under Section 12 of the Securities Exchange Act of 1934;

(ii)     another person or entity acquires at least a majority (computed on a fully diluted basis) of the capital stock of Licensee;

(iii)    Licensee sells the principal assets comprising Licensee's business operations;

(iv)     Licensee sells the principal assets of Licensee's business operations associated with the PRF technology licensed to Licensee under the License Agreement;

(v)      PRF becomes eligible to participate in a sale of capital stock of Licensee under the Stockholders Agreement; or

(vi)     a Trigger Event (as defined in Section 4.2); and

(b) the Shares are disposed of pursuant to and in conformity with an effective registration statement filed with the Commission pursuant to the 1933 Act or a valid exemption therefrom or pursuant to Rule 144 thereunder.

(c) Notwithstanding anything to the contrary in this Agreement, PRF may transfer the Shares to an affiliate of PRF; provided that such affiliate has delivered to Licensee a written agreement making the representations and acknowledgments set forth in Sections 2.3 and 2.4 and agreeing to be bound by the restrictions of this Section 3.1 with respect to the Shares so transferred

3.2 _Legends_. The certificates representing the Shares may bear the following restrictive legends:

(a) THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. SUCH SHARES HAVE BEEN ACQUIRED FOR INVESTMENT AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT IN ACCORDANCE WITH THE TERMS OF A STOCK PURCHASE AGREEMENT DATED NOVEMBER 16, 2001 BY AND BETWEEN THE COMPANY AND THE REGISTERED HOLDER HEREOF, A COPY

OF WHICH AGREEMENT IS ON FILE AT THE PRINCIPAL OFFICES OF THE
COMPANY.

(b) Any legends required by the applicable securities or "blue sky" laws of
any state or other jurisdiction.

## ARTICLE 4 – REDEMPTION RIGHTS

4.1 Redemption of Shares. From and after the occurrence of a Trigger Event (as
hereinafter defined), PRF shall be entitled at any time and from time to time, subject to the
limitations set forth in this Section 4.1, to require Licensee to purchase at the Redemption Price
(as hereinafter defined) all or such portion of the Shares as PRF may specify ("*Redemption
Rights*"). Redemption Rights shall be exercised, at the option of PRF, by providing written
notice thereof to Licensee. The Offering Date with respect to Shares proposed to be sold
pursuant to exercise of Redemption Rights shall be the date notice of such exercise is received by
Licensee.

4.2 Terms and Conditions.

(a) Redemption Price. The "*Redemption Price*" is the value determined
by an Appraisal (as hereinafter defined) pursuant to the procedures set forth in Exhibit C.

(b) Trigger Event. A "*Trigger Event*" shall mean any of the following:

(i)    The occurrence of an event of default by Licensee under
any of the Transaction Documents that remains uncured following the completion of any
applicable cure period;

(ii)    If Licensee assigns any right or delegates any obligation
under the License Agreement (with or without the prior written consent of PRF) except for
sublicenses granted by Licensee;

(iii)    If Licensee: becomes insolvent, bankrupt or generally fails
to pay its debts as such debts become due; is adjudicated insolvent or bankrupt; admits in writing
its inability to pay its debts; or shall suffer a custodian, receiver or trustee for it or substantially
all of its property to be appointed and, if appointed without its consent, not be discharged within
thirty (30) days; makes an assignment for the benefit of creditors; or suffers proceedings under
any law related to bankruptcy, insolvency, liquidation or the reorganization, readjustment or the
release of debtors to be instituted against it and if, contested by it, not dismissed or stayed within
ten (10) days;

(iv)    If proceedings under any law related to bankruptcy,
insolvency, liquidation, or the reorganization, readjustment or the release of debtors is instituted
or commenced by Licensee;

(v)    If any order for relief is entered relating to any of the
proceedings described in Sections 4.2(b)(iii) or 4.2(b)(iv);

CorMatrix.stockpurchase (1).doc                    7                    11/16/01

(vi)    If Licensee shall call a meeting of its creditors with a view to arranging a composition or adjustment of its debts;

(vii)    If Licensee shall by any act or failure to act indicate its consent to, approval of or acquiescence in any of the proceedings described in Sections 4.2(b)(iii), 4.2(b)(iv), 4.2(b)(v) or 4.2(b)(vi); or

(viii)    the 5th anniversary of the date of this Agreement if prior thereto Licensee has not consummated a Qualified Public Offering (as defined in the Stockholders' Agreement).

(c)    **Closing.** The transfer of Shares to Licensee and payment to PRF of the Redemption Price therefor shall occur simultaneously at a closing. If the Trigger Event is 4.2(b)(i), 4.2(b)(ii) or 4.2(b)(iii), then all Shares to be redeemed pursuant to Section 4.1 shall be transferred and the full Redemption Price shall be paid at a closing to be held within thirty (30) days of the Offering Date. All payments of the Redemption Price shall be by certified bank check or wire transfer of same day funds and shall not be deemed made until received by PRF. If PRF exercises its Redemption Rights so as to cause Licensee to purchase only a portion of the Shares, then Licensee shall issue a stock certificate to PRF for its remaining Shares at the closing.

(d)    **Subordination.**  PRF's right to redemption of the Shares under this Section 4.2(b)(viii) shall be subordinate to the redemption rights of any holder of Preferred Stock of Licensee whose Preferred Stock had a purchase price of at least One Million Dollars ($1,000,000.00).

## ARTICLE 5 – REGISTRATION RIGHTS

5.1 <u>Piggyback Registration Rights</u>. Whenever Licensee proposes to register any Common Stock for Licensee's own or others' account under the 1933 Act or any other securities law of any jurisdiction for a public offering for cash, other than a registration on Form S-4 or S-8 (or any comparable form), Licensee shall give each holder of Registrable Securities (as hereinafter defined) prompt written notice of Licensee's intent to do so. Upon the written request of any such holder given within thirty (30) days after receipt of such notice, Licensee will use Licensee's best efforts to cause to be included in such registration all of the Registrable Securities that such holder requests to be registered. If Licensee is advised in writing in good faith by any managing underwriter of the securities being offered pursuant to any registration statement under this Article 5 that the number of shares to be sold pursuant to such registration statement is greater than the number of such shares that can be offered without adversely affecting the offering, then Licensee shall reduce pro rata the number of shares offered for the accounts of holders of Licensee's Common Stock (based upon the number of shares proposed to be sold pursuant to such registration statement by each such holder) to a number deemed satisfactory by such managing underwriter.  No agreement of Licensee shall permit any person other than Licensee or holders of Registrable Securities to participate in any registration under this Article 5 except on the basis that any offering limitation either applies only to such other persons or is apportioned according to the number of shares of Common Stock (including Registrable Securities) held by each participant (including holders of Registrable Securities).

**5.2 Form S-3 Registration Rights**. If, at a time when Form S-3 is available for such registration, Licensee shall receive from any holder of Registrable Securities a written request or requests that Licensee effect a registration on Form S-3 of any of such holder's Registrable Securities, then Licensee shall promptly give written notice of the proposed registration to all other holders of Registrable Securities and, as soon as practicable, effect such registration and all such related qualifications and compliances (including under applicable state securities or "blue sky" laws) as may be requested or necessary to permit or facilitate the sale and distribution of all Registrable Securities as are specified in such request and any written requests of other holders given within thirty (30) days after receipt of such notice. Licensee shall not be obligated to effect more than two (2) such registrations in any twelve-month period and shall not be required to effect a registration of less than One Million Dollars ($1,000,000) in value of capital stock of Licensee.

**5.3 Definition of Registrable Securities**. "*Registrable Securities*" means the Shares, any shares of Common Stock or other capital stock of Licensee received by the holders of Shares as a stock dividend or other distribution with respect to such Shares and any other shares of the capital stock of Licensee now owned or hereafter acquired by the holder of Shares.

**5.4 Registration Procedures**. All expenses incurred in connection with the registrations under this Article V (including all registration, filing, listing, qualification, printer's and accounting fees and the reasonable fees of counsel for the holders, but excluding underwriting commissions and discounts) shall be borne by Licensee. If and whenever Licensee is under an obligation pursuant to this Article V to effect or use Licensee's best efforts to effect a registration of any Registrable Securities, Licensee shall: (a) use Licensee's best efforts to prepare and file with the Commission or applicable government authority as soon as reasonably practicable, a registration statement with respect to the Registrable Securities and use Licensee's best efforts to cause such registration to promptly become and remain effective for a period of at least one hundred twenty (120) days (or such shorter period during which holders shall have sold all Registrable Securities that they requested to be registered); (b) use Licensee's best efforts to register and qualify the Registrable Securities covered by such registration statement under applicable state securities laws as the holders shall reasonably request for the distribution of the Registrable Securities; (c) provide a transfer agent for the Common Stock no later than the effective date of the first registration of any Registrable Securities; (d) list such Registrable Securities on any national securities exchange or The Nasdaq Stock Market's National Market, or if the Common Stock is unable to be so listed, use Licensee's best efforts to qualify the Registrable Securities for inclusion on any other automated quotation system of the National Association of Securities Dealers, Inc.; and (e) take such other actions as are reasonable or necessary to comply with the requirements of the 1933 Act and the regulations thereunder, or the reasonable request of any holder, with respect to the registration and distribution of the Registrable Securities. Licensee is not obligated to effect registration or qualification under this Article V in any jurisdiction requiring Licensee to qualify to do business (unless Licensee is otherwise required to be so qualified) or to execute a general consent to service of process.

**5.5 Holdback Agreement**. If Licensee at any time shall register shares of Common Stock under the 1933 Act (including any registration pursuant to Article 6) or any other securities law of any jurisdiction for sale to the public, then PRF shall not sell publicly, make any short sale of, grant an option for the purchase of, or otherwise dispose publicly of, any shares of

CorMatrix stockpurchase (1).doc                                    9                                    11/16/01

Registrable Securities (other than those shares of Common Stock included in such registration pursuant to Article 6) without the prior written consent of Licensee or the managing underwriter of the offering for a period designated by Licensee in writing to the holders of shares of Registrable Securities, which period shall not begin more than ten (10) days prior to the effectiveness of the registration statement pursuant to which such public offer will be made and shall not last more than one hundred eighty (180) days after the effective date of such registration statement; provided that PRF shall not be obligated to refrain from any of the foregoing for a period that is greater than the minimum period required of any executive officer or director of Licensee or person holding, or having the right or option to acquire equity securities representing more than five percent (5%) of the equity securities of Licensee or if any such person is not so required.

5.6 Underwriting Arrangement. In connection with each registration pursuant to Article 6 covering an underwritten public offering, Licensee and each participating holder agree to enter into a written agreement with the managing underwriter in such form and containing such provisions as are reasonably acceptable to each such participating holder and are customary in the securities business for such an arrangement between such underwriter and companies of Licensee's size and investment stature.

5.7 Notification. Licensee shall promptly notify each holder of Registrable Securities covered by any registration statement of any event that results in the prospectus included in such registration statement, as then in effect, containing an untrue statement of a material fact or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing.

5.8 Furnishing of Documents. At the request of any participating holder, Licensee will furnish to each underwriter, if any, and participating holders, a legal opinion of its counsel and a "cold comfort" letter from its independent certified public accountants, each in customary form and substance, at such time or times as such documents are customarily provided in the type of offering involved. As expeditiously as possible, Licensee shall furnish to each participating holder such reasonable numbers of copies of the prospectus, including a preliminary prospectus, in conformity with the requirements of the 1933 Act, and such other documents as the participating holder may reasonably request in order to facilitate the public sale or other disposition of the Registrable Securities owned by the participating holders.

5.9 Indemnification and Contribution.

(a) In the event of a registration of any of the Registrable Securities under the 1933 Act or any other securities law of any jurisdiction pursuant to Article V, Licensee will indemnify and hold harmless PRF, and each person, if any, who controls PRF within the meaning of the 1933 Act, and each employee, officer and trustee of PRF against any losses, claims, damages or liabilities, joint or several, to which PRF, or each such controlling person, employee, officer or trustee may become subject under the 1933 Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any registration statement under which such Registrable Securities was registered under the 1933 Act or any other securities law of any jurisdiction pursuant to Article V, any preliminary prospectus

or final prospectus contained therein, or any amendment or supplement thereof, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse PRF, and each such controlling person, employee, officer or trustee for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; provided that Licensee will not be liable in any such case if and to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission so made in conformity with information furnished by PRF or any such controlling person, employee, officer or trustee in writing specifically for use in such registration statement or prospectus.

(b) In the event of a registration of any of the Registrable Securities under the 1933 Act or any other securities law of any jurisdiction pursuant to Article V, PRF will indemnify and hold harmless Licensee, each person, if any, who controls Licensee within the meaning of the 1933 Act, officer of Licensee who signs the registration statement, director of Licensee, underwriter and person who controls any underwriter within the meaning of the 1933 Act, against all losses, claims, damages or liabilities, joint or several, to which Licensee or such officer, director, underwriter or controlling person may become subject under the 1933 Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the registration statement under which such Registrable Securities was registered under the 1933 Act or any other securities law of any jurisdiction pursuant to Article V, any preliminary prospectus or final prospectus contained therein, or any amendment or supplement thereof, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse Licensee and each such officer, director, underwriter and controlling person for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; provided that PRF will be liable hereunder in any such case if and only to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in reliance upon and in conformity with information pertaining to PRF, as such, furnished in writing to Licensee by PRF specifically for use in such registration statement or prospectus; and provided, further, that the liability of PRF hereunder shall not in any event exceed the amount of the proceeds received by PRF from the sale of Registrable Securities covered by such registration statement.

(c) Promptly after receipt by an indemnified party hereunder of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party hereunder, notify the indemnifying party in writing thereof, but the omission so to notify the indemnifying party shall not relieve the indemnifying party from any liability which the indemnifying party may have to such indemnified party other than under this Section 5.9 and shall only relieve the indemnifying party from any liability which the indemnifying party may have to such indemnified party under this Section 5.9 if and to the extent the indemnifying party is prejudiced by such omission. In case any such action shall be brought against any indemnified party and the indemnified party shall notify the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate in and, to the extent the indemnifying party shall wish, to assume and undertake the defense thereof with

counsel satisfactory to such indemnified party, and, after notice from the indemnifying party to such indemnified party of the indemnifying party's election so to assume and undertake the defense thereof, the indemnifying party shall not be liable to such indemnified party under this Section 5.9 for any legal expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation and of liaison with counsel so selected; provided that, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be reasonable defenses available to the indemnified party which are different from or additional to those available to the indemnifying party or if the interests of the indemnified party reasonably may be deemed to conflict with the interests of the indemnifying party, then the indemnified party shall have the right to select a separate counsel and to assume such legal defenses and otherwise to participate in the defense of such action, with the expenses and fees of such separate counsel and other expenses related to such participation to be reimbursed by the indemnifying party as incurred.

(d) In order to provide for just and equitable contribution to joint liability under the 1933 Act or any other securities law of any jurisdiction in any case in which either: (i) any holder of Registrable Securities exercising rights under this Agreement, or any controlling person of any such holder, makes a claim for indemnification pursuant to this Section 5.9 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case notwithstanding the fact that this Section 5.9 provides for indemnification in such case, or (ii) contribution under the 1933 Act or any other securities law of any jurisdiction may be required on the part of any such selling holder or any such controlling person in circumstances for which indemnification is provided under this Section 5.9; then, and in each such case, Licensee and such holder will contribute to the aggregate losses, claims, damages or liabilities to which they may be subject (after contribution from others) as is appropriate to reflect the relative fault of Licensee and such holder in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities, as well as the relative benefit received by Licensee and such holder as a result of the offering in question, it being understood that the parties acknowledge that the overriding equitable consideration to be given effect in connection with this provision is the ability of one party or the other to correct the statement or omission which resulted in such losses, claims, damages or liabilities, and that it would not be just and equitable if contribution pursuant hereto were to be determined by pro rata allocation or by any other method of allocation that does not take into consideration the foregoing equitable considerations; provided that, in any such case: (i) no such holder will be required to contribute any amount in excess of the public offering price of all such Registrable Securities offered by such holder pursuant to such registration statement; and (ii) no person or entity guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the 1933 Act) will be entitled to contribution from any person or entity who was not guilty of such fraudulent misrepresentation.

5.10    Removal of Legends, Etc. Notwithstanding anything in this Agreement to the contrary, the restrictions imposed by Articles III on the transferability of any Shares shall cease and terminate when: (a) any such Shares are sold or otherwise disposed of in accordance with the intended method of disposition by the seller or sellers thereof set forth in a registration statement or such other method that does not require that the securities transferred bear the

legend set forth in Section 3.2; or (b) the holder of such Shares has met the requirements for transfer pursuant to subparagraph (k) of Rule 144 (as amended from time to time) promulgated by the Commission under the 1933 Act. Whenever the restrictions imposed by Article 3 have terminated, a holder of a certificate for such Shares as to which such restrictions have terminated shall be entitled to receive from Licensee, without expense, a new certificate not bearing the restrictive legend set forth in Section 3.2 and not containing any other reference to the restrictions imposed by this Agreement.

5.11    Changes in Common Stock. If, and as often as, there is any change in the Common Stock by way of a stock split, stock dividend, combination or reclassification, or through a merger, consolidation, reorganization or recapitalization, or by any other means, then appropriate adjustment shall be made in the provisions of this Agreement so that the rights and privileges granted hereby shall continue with respect to the Common Stock as so changed.

5.12    Preparation of Registration Statements. Whenever Licensee is registering any Common Stock under the 1933 Act or any other securities law of any jurisdiction and a holder of Registrable Securities is selling any securities under such registration or determines that it may be a controlling person under such 1933 Act or any other securities law of any jurisdiction, Licensee will allow such holder and its counsel to participate in the preparation of the registration statement, will include in the registration statement such information as such holder may reasonably request and will take all such other action as such holder may reasonably request.

5.13    Transferability of Registration Rights. The registration rights described in Sections 5.1 and 5.2 are freely transferable by the holders of Registrable Securities to any person to whom such holder transfers Registrable Securities.

5.14    Expiration. No holder of Registrable Securities shall have any further rights under Section 5.1 or 5.2 with respect to registration of its Registrable Securities at any time during which such holder may sell all its shares under Rule 144 without regard to volume limitations.

ARTICLE 6 – ADDITIONAL PROVISIONS

6.1 License Agreement. Nothing in this Agreement shall limit the right of PRF to terminate the License Agreement in accordance with the terms of the License Agreement.

6.2 Survival. All agreements, representations and warranties contained in this Agreement shall survive the execution and delivery of this Agreement, any investigation at any time made, the sale and purchase of the Shares, and any disposition of the Shares. All statements contained in a certificate or other instrument executed and delivered by Licensee or Licensee's duly authorized officers pursuant to this Agreement or in connection with the transactions contemplated hereby shall constitute additional representations and warranties by Licensee hereunder.

6.3 Governing Law and Jurisdiction. This Agreement shall be governed by and interpreted under the laws of the State of Indiana, without giving effect to the principles of conflicts of law of any jurisdiction. In the event that a party to this Agreement perceives the

existence of a dispute with the other party concerning any right or duty provided for in this Agreement, the parties will, as soon as practicable, confer in an attempt to resolve the dispute. If the parties are unable to resolve such dispute amicably, then the parties hereby submit to the exclusive jurisdiction of and venue in the state and federal courts located in Tippecanoe County, Indiana with respect to any and all disputes concerning the subject, or arising out, of this Agreement, and such courts shall have sole and exclusive jurisdiction and venue over such disputes.

6.4 Notices. All notices and other communications required or permitted hereunder or necessary or convenient in connection herewith shall be in writing and shall be deemed to have been given when hand delivered, one (1) business day after mailing when mailed by overnight courier (e.g., Federal Express or Express Mail) or upon receipt when successfully transmitted by facsimile and confirmed by facsimile report, as follows (provided that notice of change of address shall be deemed given only when received):

If to Licensee, to:

David Camp
CorMatrix Cardiovascular, Inc.
14980 East Bluff Road.
Alpharetta, GA 30004
Fax: 770-751-3757

If to PRF, to:

Lisa Kuurtila
Office of Technology Commercialization
Purdue Research Foundation, Inc.
1291 Cumberland Avenue
West Lafayette, Indiana 47906
Fax: 765-496-1277

With a required copy to:

General Counsel
Stuart & Branigin, LLP
P.O. Box 1010
Lafayette, IN 47902-1010
Facsimile: (765) 742-5871

or to such other names or addresses as Licensee or PRF, as the case may be, shall designate by notice to each other person entitled to receive notices in the manner specified in this Section 6.4.

6.5 No Waiver. No waiver of any breach or condition of this Agreement shall be deemed to be a waiver of any other or subsequent breach or condition, whether of like or different nature.

6.6 Binding Nature of Agreement and No Assignment. All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto. This Agreement may not be

changed, modified, extended or terminated except by a written amendment executed by an authorized representative of each party.

      6.7 Counterparts, Headings and Exhibits. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The headings used in this Agreement are for convenience only and are not to be considered in construing or interpreting any term or provision of this Agreement. All Schedules and Exhibits hereto are hereby incorporated in this Agreement and made a part of this Agreement.

      6.8 Severability. If any provision of this Agreement shall be held to be illegal, invalid or unenforceable, then such illegality, invalidity or unenforceability shall attach only to such provision and shall not in any manner affect or render illegal, invalid or unenforceable any other provision of this Agreement, and this Agreement shall be carried out as if any such illegal, invalid or unenforceable provision were not contained in this Agreement.

      6.9 Number of Days. In computing the number of days for purposes of this Agreement, all days shall be counted, including Saturdays, Sundays and holidays; provided that if the final day of any time period falls on a Saturday, Sunday or holiday on which Federal Banks are or may elect to be closed, then the final day shall be deemed to be the next day which is not a Saturday, Sunday or such holiday.

      6.10   Integration. This Agreement and the other Transaction Documents supersede all prior agreements and set forth the entire understanding among the parties hereto and thereto with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings relating to the subject matter hereof and thereof.

*(signature page follows)*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first written above.

CORMATRIX CARDIOVASCULAR, INC.          PURDUE RESEARCH FOUNDATION, INC.

By: _David B. Camp_____

Name: _DAVID B. CAMP_____

Title: _PRESIDENT / CEO_____

By: _Martin C. Jischke_____

Name: _MARTIN C. JISCHKE_____

Title: _President_____